## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

WATERFRONT PETROLEUM
TERMINAL COMPANY,

      Plaintiff/Counter-Defendant,

v.                                        Case No. 19-13621

DETROIT BULK STORAGE, INC.,

      Defendant/Counter-Plaintiff.
_____/

### OPINION AND ORDER DENYING IN PART CROSS-MOTIONS
### FOR SUMMARY JUDGMENT

Plaintiff Waterfront Petroleum Terminal Company ("Waterfront") and Defendant

Detroit Bulk Storage, Inc. ("DBS") the owner and lessor, respectively, of maritime

facilities on the Detroit River, are litigating over the usage of wharf space at the

adjoining facilities, among other issues. The parties have filed cross-motions for

summary judgment seeking to determine their respective usage rights. (*See* ECF Nos.

43, 44.)[1] The court finds a hearing unnecessary. E.D. Mich. L.R. 7.1(f)(2). The court will

deny, in part, both parties' motions for summary judgment, as factual disputes exist that

prevent the court from definitively determining if Defendant's use of the wharf space is

reasonable under the applicable Michigan common law standard.

_____

[1] At the joint request of the parties, the court will not consider in this opinion any issue related to Defendant's counterclaim regarding a dock collapse. The parties mutually requested that the court delay consideration of the counterclaim, and related issues, in light of Defense counsel's illness.

## I.   BACKGROUND

Since 2007, Plaintiff Waterfront has operated a marine fuel terminal, with a physical address of 5431 West Jefferson Avenue, for commercial vessels on the Detroit River. (ECF No. 43-3, PageID.998; ECF No. 44, PageID.1232.) Later, Plaintiff purchased two adjoining parcels at 5701 and 5601 West Jefferson with dock frontage immediately downriver of its fueling terminal. (ECF No. 43-3, PageID.994.) Plaintiff used the newly acquired land to open a bulk cargo terminal to accept deliveries from the freighters operating on the Great Lakes. (*Id.*) Plaintiff's three parcels together provide approximately 1,783 combined linear feet of dock frontage on the Detroit River. (ECF No. 57-5, PageID.2541.) Plaintiff's facility is outlined in red in Figure 1 below.

In 2019, Defendant DBS entered a month-to-month lease[2] for a riverfront parcel at 5851 West Jefferson (the "Revere Dock"), which is owned by Revere Dock, LLC. (ECF No. 43-2, PageID.952-53.) The Revere Dock has approximately 540 feet of river frontage and is immediately adjacent to Waterfront's bulk dock. (ECF No. 43-2, PageID.954.) The Revere Dock is bordered by Plaintiff's facility upstream and by an active boat slip and marine facility operated by the U.S. Army Corps of Engineers on the downstream side. (ECF No. 43-2, PageID.960.) Defendant operated a bulk cargo facility at the Revere Dock between August and November 2019 until a dock collapse on the parcel suspended operations at the Revere Dock (the dock collapse is the subject of

---

[2] While the issue of whether a lease exists, oral or otherwise, is factually contested by the parties (*see* ECF Nos. 48, 56), when considering Plaintiff's motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party so for the purposes of Plaintiff's motion the court will assume such a lease exists.

Defendant's counterclaim). (ECF No. 44, PageID.1234; ECF No. 57-5, PageID.2545.) The Revere Dock parcel is outlined in yellow in Figure 1 below.



**Figure 1** (ECF No. 57-5, PageID.2542.)

Both parties are owned by individuals with substantial experience operating maritime facilities. Plaintiff's owner, Harry Warner, has been operating petroleum facilities on the Great Lakes since 1976. (ECF No. 43-3, PageID.996.) Warner's other facilities include a location on the Rouge River in Detroit and a maritime facility in the Chicago area. (ECF No. 43-5, PageID.1047.) Defendant's principal owner, Jack Frye, started his bulk aggregate business in Detroit in 1985 and now operates two such docks in Michigan and seven docks through a sister company on the Canadian side. (ECF No. 43-13, PageID.1199-1200.)

When the Revere Dock was active during 2019, Defendant received 21 separate deliveries of bulk aggregate at the facility from freighters ranging between approximately 625 and 750 feet in length. (ECF No. 57-5, PageID.2545.) While in full operation, Defendant received about one delivery every five-and-a-half days on average. (*See id.*)

To make a delivery, a freighter docks parallel to the river bank a few feet from the wharf. Lake freighters have a long "self-unloading" boom containing a conveyor belt that swings to shore and dumps large piles of bulk cargo on the dock. (ECF No. 43-13, PageID.1204, 1207.) These piles are later loaded into trucks for distribution to the customer. While unloading bulk cargo, it is customary for the moored freighters to move ahead and astern along the dock by an action known as "warping" (using their mooring lines) to facilitate the freighter's self-unloading boom to place piles of material on the requested section of dock. (ECF No. 57-5, PageID.2546.) To unload a full freighter, it can take between five and seven-and-a-half hours. (ECF No. 43-2, PageID.955.)

It is undisputed that the length of the vessels meant that freighters calling at the Revere Dock regularly extended in front of Waterfront's neighboring property, thereby blocking access to the most downriver portion of its property where Plaintiff now operates its own bulk dock; depending on the size of the vessel that is "warping" the encroachment could extend 100 to 200 feet beyond the property line. (ECF No. 43, PageID.906; ECF No. 44, PageID.1233, 1245.) Plaintiff does not allege that Defendant's employees trespassed on Plaintiff's dock front itself during the unloading process or physically moored the freighters to its dock. (*See* ECF No. 57-5, PageID.2546.) And Plaintiff's owner Henry Warner acknowledged that the 2019 encroachments did not cause Plaintiff to turn away or delay any vessels at its very active fueling dock on the upstream portion of the property. (ECF No. 43-3, PageID.1005.) Nor is Plaintiff claiming any lost profits from the 2019 encroachments.[3]

---

[3] The only effect from Defendant's 2019 operations at the Revere Dock uncovered during discovery was a Waterfront employee's recollection that on at least one occasion, he was forced to anchor a company-owned barge in the Detroit River for

(*id.*; *see also* ECF Nos. 43-8, 43-9, PageID.1082-84 (noting that only three deliveries to Waterfront's bulk dock facility occurred during 2019 and ten during the 2020 shipping season).)

Plaintiff alleges that the mooring of vessels so large that they extend in front of its property constitutes a maritime trespass, and Plaintiff began formally notifying Defendant on August 12, 2019 that it would take legal actions to prevent such encroachments in the future. (ECF No. 44-2, PageID.1269.) During 2020, while Defendant's operations were suspended due to the Revere Dock collapse, Plaintiff used some of a $3 million line of credit to fund seawall upgrades to what is now the downriver bulk dock portion of its facility. Warner testified that Plaintiff plans to add a "second [fueling] berth," use the improved dock as a staging, or as a storage area for some of its barges currently docked at other rented maritime facilities in the region. (ECF No. 43-3, PageID.997, 1018.) Plaintiff contends that Defendants continued encroachment will prevent it from fully utilizing its own property to its potential and could cause his business to incur demurrage charges (late fees) if the dock is not available to a calling vessel at the time promised by Waterfront. (ECF No. 44, PageID.1237.) Warner also raises safety concerns about Defendant's operations.

Plaintiff filed the present action in December 2019, relying on the court's jurisdiction over admiralty and maritime controversies through 28 U.S.C. § 1333. (*See* ECF No. 1.) Plaintiff requests both declaratory and injunctive relief to prevent future encroachments in front of its wharf and seeks damages for maritime trespass during the

---

three hours while he waited to fuel at Waterfront's fueling terminal instead of being able to dock the barrage at Waterfront's bulk dock until the fueling station was available. (ECF No. 43-5, PageID.1051-52.)

2019 shipping season. The parties have now completed extensive discovery in the action and have filed cross-motions for summary judgment on the encroachment issue. (*See* ECF Nos. 43, 44.)

Defendant argues that it should be awarded summary judgment because the Michigan Supreme Court's 1932 decision in *Rosema v. Construction of Materials Corp.*, 258 Mich. 457; 243 N.W. 24 (1932), adopted a common law rule establishing that a neighboring riparian landowner can moor a vessel beyond the property line as long as reasonable access is not obstructed, and, that Michigan does not recognize a cognizable claim for maritime trespass in such a situation. (ECF No. 43, PageID.915, 920-22.)

Defendant further contends, based on the testimony of its owner Jack Frye, that such encroachment on neighboring docks is a regular and customary occurrence at industrial docks on the Great Lakes. (*Id.,* PageID.909.) It further points out that Plaintiff engages in the same practice, at least twice each month, when it fuels 1,000-foot freighters at its Detroit fuel terminal that undisputedly protrude 80 feet over the property line in front of the dock of Plaintiff's upstream neighbor, the James Group. (*Id.*) Defendant notes that one of the three vessels that made a delivery to Plaintiff's bulk dock during 2019 also hung over the property line in front of the Revere Dock. (ECF No. 43-2, PageID.974.) Defendant substantiates its position regarding local custom with the affidavit of an expert witness. (*See* ECF No. 43-14.)

Plaintiff contrastingly argues that it should be awarded summary judgment on the wharf usage dispute because, as a riparian property owner, it has the right to prohibit Defendant from mooring a ship on its bottomlands only a few feet from the edge of its

6

bulk dock. While Plaintiff recognizes that the "[t]he use of water by the riparian owner is governed by the principles of reasonableness" and that "reasonableness depends on the facts of the case," it argues routinely docking vessels over 650 feet in length at a dock only 540 feet long, is not merely an incidental trespass and therefore should not be considered reasonable. (ECF No. 44, PageID.1249-50 (citing *Hoover v. Crane*, 362 Mich. 36, 106 N.W.2d 563 (1960); *W. Michigan Dock & Mkt. Corp. v. Lakeland Invs.,* 534 N.W.2d 212, 216 (Mich. App. 1995)).) In Plaintiff's view, it was not reasonable for Defendant to expect it could operate a bulk aggregate business on a riverfront parcel not long enough to accommodate even the smallest freighter calling at the facility. Plaintiff acknowledges that Defendant's encroachment during the "narrow" four-month period that Defendant operated at the Revere Dock before the collapse "did not interfere with Waterfront's business," but points to deposition testimony by Warner and his employees explaining that Plaintiff plans "to expand the operation of his fuel terminal within the entire footprint of the property [it] own[s]." (*Id.*, PageID.1251.) Plaintiff argues that its planned increase in use of its current bulk dock makes increased conflicts inevitable. Plaintiff also provides an affidavit from an expert witness supporting its position. (*See* ECF No. 57-5.)

## II.  STANDARD

To prevail on a motion for summary judgment, a movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presenting evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement that

the moving party "support its motion with [evidence] negating the opponent's claim." *Id.*

(emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69

F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing

that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This

requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere

possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v.*

*Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary

judgment, "the evidence [must be] such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the

underlying facts must be drawn "in the light most favorable to the party opposing the

motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit*

*LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### III. DISCUSSION

The court must first determine if it has jurisdiction over the present dispute. While

neither party contests Plaintiff's assertion that this court has jurisdiction under 28 U.S.C.

§ 1333, the court is always "under an independent obligation to examine their own

jurisdiction," *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), and a federal

court may not entertain an action over which it has no jurisdiction. *See Insurance Corp.*

*of Ireland. Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). "[A]

party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1)

over a tort claim must satisfy conditions both of location and of connection with maritime

activity." *Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

Because Plaintiff brings a claim for "maritime trespass," a tort that allegedly occurred on

the navigable water of the Detroit River, concerning a "traditional maritime activity"—

docking and unloading a bulk freighter—that could "potentially [have a] disruptive impact

on maritime commerce" of its neighbor, the court concludes that the test for admiralty

jurisdiction has been satisfied. *See id.* (applying the test for admiralty jurisdiction over a

tort claim); 80 A.L.R. Fed. 105.

When considering a suit brought under admiralty jurisdiction, the court must

apply federal admiralty law to the dispute including, "'the application of substantive

admiralty law'" rather than state law. *Matheny v. Tennessee Valley Auth.*, 503 F. Supp.

2d 917, 921-22 (M.D. Tenn. 2007) (quoting *Yamaha Motor Corp., U.S.A. v. Calhoun*,

516 U.S. 199, 206 (1996).) "[S]tate law is [still] to be applied where it 'fills gaps' or

provides relief that otherwise would not be available under admiralty law; but, where

state law would supersede or limit clearly defined maritime causes of action, it cannot

be applied." *Matheny v. Tennessee Valley Auth.*, 503 F. Supp. 2d 917, 922 (M.D. Tenn.

2007) (citing *Yamaha Motor Corp.*, 516 U.S. at 204-05).

The ownership of the bottomlands of a navigable body of water is generally

considered an area left to state law. *See Montana v. United States*, 450 U.S. 544, 551

(1981) ("After a State enters the Union, title to the land is governed by state law."). "The

State's power over the beds of navigable waters remains subject to only one limitation:

the paramount power of the United States to ensure that such waters remain free to

interstate and foreign commerce." *Id.* Therefore, the nature and extent of riparian rights

9

acquired through landownership along the Detroit River must be determined based largely on Michigan law.

The bottomlands of the Great Lakes are retained in public trust by the adjoining states. *See Glass v. Goeckel,* 473 Mich. 667, 694, 703 N.W.2d 58, 73 (2005) ("[T]he public trust doctrine serves to protect. . . the waters of the Great Lakes and their submerged lands-shared in common by the public"); *Gunderson v. State, Indiana Dep't of Nat. Res.*, 90 N.E.3d 1171, 1182-83 (Ind. 2018) (same); *State ex rel. Merrill v. Ohio Dep't of Nat. Res.*, 955 N.E.2d 935, 950 (Ohio 2011) (same). In contrast, Michigan courts have found that the state transferred title to the bottomlands of the St. Clair and Detroit rivers to the owners of riparian property along their banks in the same way littoral/riparian[4] rights are divided among landowners on inland lakes and rivers in Michigan. *See Lorman v. Benson*, 8 Mich. 18, 32 (1860) (holding that a riparian landowner also acquires title to the bottomlands extending to the midpoint of the Detroit River so, "plaintiff is entitled to every beneficial use of the property in question which can be exercised with a due regard to the common easement [for navigation]"); *Michalik v. Just.*, No. 209109, 1999 WL 33430147, at *2 (Mich. Ct. App. Nov. 9, 1999) ("[T]he boundaries of [the parties] riparian rights must be established by drawing lines

---

[4] In modern usage "littoral" property refers to waterfront property boarding a lake or ocean, by contrast, "riparian" landowners are those whose property is adjacent to or abutting a river or stream. *See* Black's Law Dictionary (11th ed. 2019). Michigan case law on which this opinion heavily relies, however, "has not always precisely distinguished between the two terms." *Glass v. Goeckel*, 473 Mich. 667, 672, 703 N.W.2d 58, 61 n.1 (2005). As such, consistent with the language of these opinions, the court uses the term "riparian rights" to refer to rights acquired by both littoral and riparian landowners.

perpendicular to the middle, or 'thread,' of the St. Clair River.") (citing *Campau Realty Co v. City of Detroit*, 162 Mich. 243, 245; 127 NW 365 (1910)).

And to determine if Defendant trespassed on Plaintiff's bottomlands by consistently docking boats in front of his property, the court relies on Michigan common law because "no rule of trespass exists in maritime law," so the court must look to other common law sources to fill in the gaps. *Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992); *see also Just v. Chambers,* 312 U.S. 383, 388, (1941) ("With respect to maritime torts we have held that the State may modify or supplement the maritime law by creating liability which a court of admiralty will recognize and enforce when the state action is not hostile to the characteristic features of the maritime law or inconsistent with federal legislation."). Therefore, the court will look to Michigan law in making its determination.

### A. The Rights of Neighboring Riparian Rightsholder

Both parties agree that the use of water by riparian landowners is governed by the rule of reasonableness. (*See* ECF No. 43, PageID.915; ECF No. 44, PageID.1249.) The definition of reasonable use depends on the facts of the case. *Hoover v. Crane*, 362 Mich. 36, 106 N.W.2d 563 (1960). The Michigan courts have developed a three-part test for determining what constitutes a reasonable use:

> First, attention should be given to the size, character and natural state of the water course. Second, consideration should be given the type and purpose of the uses proposed and their effect on the water course. Third, the court should balance the benefit that would inure to the proposed user with the injury to the other riparian owners.

*Three Lakes Ass'n v. Kessler*, 285 N.W.2d 300, 303 (Mich. App. 1979) (citing *Thompson v. Enz*, 379 Mich. 667, 686-87, 154 N.W.2d 473, 484 (1967)).

11

Balancing the benefits and potential harms of Defendant's use of the river is by its nature a highly case-specific, fact-intensive exercise. Both sides separately contend that the facts, combined with the relevant precedent on the use of wharf space, support summary judgment in their favor. To ascertain the reasonableness of Defendant's conduct, the court must first review the various Michigan court decisions involving disputes over the usage of wharf space.

The leading Michigan precedent on wharf usage by neighboring riparian owners is *Rosema v. Constr. Materials Corp.*, a short 1932 Michigan Supreme Court decision. 258 Mich. 457, 243 N.W. 24 (1932). In *Rosema*, the plaintiffs, who owned 500 feet of undeveloped river frontage on the Grand River, challenged a neighboring gravel pit's "almost daily" practice of tying up boats at the end of the gravel pit's dock "so that the stern of the boat would project out into the water in front of plaintiffs' property, but leave considerable space between the water line and the boat." 258 Mich. at 458, 243 N.W. at 25. The court rejected the plaintiffs' request for injunctive relief and instead opted to adopt the "correct rule" from *Original Hartlepool Collieries Co. v. Gibb* an English Chancery Court decision. *Id.* (citing (1877) 5 Ch. D. 713 (Eng.)). While noting that it was "not confronted with a situation where there are adjoining wharves or docks, or where plaintiffs are being deprived of free access to their property," the *Rosema* court held that "a riparian owner has a right to moor a ship of ordinary size alongside his wharf, to load or unload, although his ship may overlap his neighbor's premises; *provided reasonable access is not obstructed*." *Id* (emphasis added).[5]

---

[5] The court was also clear that while a vessel is allowed to overlap a neighboring riparian owner's bottomlands, that does not mean the vessel's owner acquires a

12

The *Original Hartlepool* decision, which the Michigan Supreme Court expressly endorsed as the "correct rule," is perhaps more factually analogous to the present dispute. The plaintiffs in *Original Hartlepool* ran a bulk coal dock on a leased property with 125ft of wharf space on the River Tames in London.[6] 5 Ch. D. at 713-14. The plaintiffs sued when a neighboring riparian landowner (defendant) tied unused wooden rafts to his wharf to prevent the plaintiffs from docking a 175-foot coal freighter at the plaintiff's wharf. *Id*. When docked, the plaintiff's vessel would physically overlap part of the defendant's adjoining wharf. *Id*. The defendant argued that the plaintiff kept the ship "moored for an unreasonable time, thus depriving [him] of access to, and reasonable use of the frontage" while also creating a "dangerous obstruction to access to [his] dock." *Id*. at 714-15. The court found that the docking of the 175-foot vessel for the delivery of coal was an "ordinary" use of the land for a "proper purpose." *Id*. at 720. Analogizing to the parking of a carriage in the street that overlapped in front of a

---

prescriptive easement. *See Rosema v. Constr. Materials Corp.,* 258 Mich. 457, 459, 243 N.W. 24, 25 (1932).

[6] Plaintiff argues, in the alternative, that the holdings of the *Rosema* and *Original Hartlepool* decisions do not apply because "DBS is not the riparian owner" as, at most, it leases the "Revere Dock" under a month-to-month lease. (ECF No. 57, PageID.2457.) Such an argument is unavailing for two reasons. First, a close reading of *Original Hartlepool* shows that the plaintiff asserting the right to use his neighbor's wharf space was also a lessee. *See* (1877) 5 Ch. D. 713 (Eng.). Second, the Michigan Supreme Court long ago determined that a lessee of riparian property, by default, "under his lease" has "a legal interest in the land covered with water." *See Lorman v. Benson,* 8 Mich. 18, 34 (1860) (holding that a lessee of property fronting the Detroit River could bring an "action of trespass" against a neighboring landowner for holding logs on the water in front of the lessee's property, thereby preventing the lessee from commercially cutting ice). As a lessee, Defendant has acquired the same riparian rights "for all purposes not prohibited by the terms of the lease" that were possessed by the owner. *See United Coin Meter Co. v. Gibson,* 311 N.W.2d 442 (1981) (noting that a lease gives the lessee "possession of the property leased and exclusive use or occupation of it for all purposes not prohibited by the terms of the lease"). Plaintiff points to no case law contradicting this general rule.

neighbor's house, the court concluded that "there is no law that your vessel shall be the exact length of your wharf." *Id.* The court concluded the plaintiff's docking of a boat overlapping his neighbor's wharf "for about 100 days in a year," for only part of the day, was not unreasonable. *Id.* at 723. But the court noted that the plaintiff should move their vessel when "asked to get out of the way." *Id.*

Michigan case law continues to apply these principles to similar disputes. In *W. Michigan Dock & Mkt. Corp. v. Lakeland Invs.*, the court considered a dispute between owners of adjacent waterfront industrial properties on Lake Muskegon. 534 N.W.2d 212, 214 (Mich. App. 1995). The parties owned two adjoining commercial piers that extended into the lake; the wharves were "separated by approximately 390 feet of water [forming] a fully navigable boat slip." *Id.* The shoreline between the two wharves was owned by the plaintiff, who sought to prevent the defendant from mooring vessels, including a World War II submarine serving as a public museum, within the slip because it reasoned that any docking vessels tied to the defendant's wharf, would be trespassing on the bottomlands that the plaintiff owned. *Id.* The trial court found that the "[defendant] as a riparian owner on Muskegon Lake, had the right to reasonable use of the waters of the boat slip and that reasonable riparian use was a *question of fact requiring a trial*." After holding a bench trial, the court entered an order "allowing [defendant] to load and unload boats and ships in the slip, but prohibiting it from anchoring vessels to the slip's lake bed and from docking vessels for more than one week without plaintiff's permission." *Id.* at 215-16. The Michigan Court of Appeals affirmed in a published opinion. Citing the commercial nature of the lake and the historical use of the boat slip as factors supporting the trial court's decision, it held that "the [trial] court properly

balanced the benefit that would inure to defendant with the injury to [the plaintiff] and other riparian owners" in determining that the defendant retained some ability to use the boat slip. *Id.* at 216.

While Defendant first contends that Michigan does not recognize a cause of action for maritime trespass when a boat is merely in position over a riparian owner's bottomlands (*see* ECF No. 43, PageID.920-22), precedent shows how this argument falters. In *Lorman*, the Michigan Supreme Court first recognized that a plaintiff riparian rightsholder, who was prevented from "exercise[ing]. . .[the] valuable privilege" of ice cutting over his bottomlands, had a claim for "*trespass*. . . as a direct consequence of the injury." *Lorman*, 8 Mich. at 32-33 (finding that the storing of defendant's logs in a boom that floated over the plaintiff's Detroit River bottomlands was no more reasonable "than [claiming] the right to travel a highway justifies the leaving of wagons standing indefinitely in front of private dwellings or stores") (emphasis added). The existence of a cognizable common law tort claim for maritime trespass is further supported by *W. Michigan Dock & Mkt. Corp.*, which affirmed the trial court's authority to limit the length of time that the defendant could dock vessels over the plaintiff's bottomlands.[7] 534 N.W.2d at 216; *see also*, *People v. Kabongo*, No. 159346, --- N.W.2d ----, 2021 WL 2024494, at *24 (Mich. May 20, 2021), *reh'g denied* (recognizing "Ubi jus, ibi remedium,

---

[7] While DBS points out that the plaintiff in *W. Michigan Dock & Mkt. Corp. v. Lakeland Invs.* was awarded $5,000 for three feet of permanent encroachment by the wharf but received no momentary damages due to the defendant's docking of vessels over its bottomlands, the lack of a damage award in that case does not mean such temporary maritime trespasses are always incognizable. 210 Mich. App. 505, 514, 534 N.W.2d 212, 217 (1995). The opinion does not indicate that the plaintiff in that case even sought such damages or provided proof of losses that would justify anything more then a nominal damage award for the trespass committed by vessels.

15

the principle that where one's right is invaded or destroyed, the law gives a remedy to protect it or damages for its loss") (citation omitted). Without proof of a specific injury, however, a plaintiff is limited to nominal damage for a past trespass.[8] *Adams v. Cleveland-Cliffs Iron Co.*, 237 Mich. App. 51, 60, 602 N.W.2d 215, 219 (1999); *see also* American Law of Torts § 23:37 (noting that "in any action of trespass, it is usually stated that the plaintiff is always entitled to, at least, nominal damages.").

In sum, the court finds that Defendant's docking of vessels that overhang the property line but are not tied to a neighbor's wharf does not automatically constitute a trespass as a matter of law.[9] *See Rosema*, 243 N.W. at 25. Rather, to determine if

---

[8] Because the Plaintiff in the present case can show no meaningful injury to its business (*see* ECF No. 43-3, PageID.1005), even if it is ultimately successful in proving at trial that Defendant's actions constituted a trespass, his recovery for Defendant's past actions is limited to nominal damages.

[9] Plaintiff's response brief also muddies the precedential waters by citing *Hall v. Wantz*, 336 Mich. 112, 57 N.W.2d 462 (1953), to argue that Defendant is not protected by the "servitude for commercial navigation" when Defendant unloads vessels that overhang the property line. (*See* ECF No. 53, PageID.2260-62.) Plaintiff claims that *Hall* stands for the proposition that even a "[n]eighboring riparian owner (which [Defendant] DBS is not) cannot make use of the water as a situs for carrying on a private enterprise without the consent of the other riparian owner." (*Id.*) This reading is incorrect. *Hall* involved a trespass claim brought against a defendant who had indefinitely anchored a large barge containing a house and fishing business in the middle of an inland lake and "own[ed] no property on the lake shore or *riparian rights whatsoever.*" *Hall*, 57 N.W.2d at 463-64 (emphasis added). The *Hall* court awarded injunctive relief to the lake's riparian landowners because it found that, while a member of the public had a right to navigate on the lake which included an incidental "right to [temporally] anchor," the public easement did "not include. . . the right to anchor indefinitely off the riparian owner's premises, particularly when. . . it is attended with dumping of refuse." *Id.* at 164. *Hall* expressly considers only the limitations of public easement for navigation and does not consider the more extensive riparian privileges granted by the common law to neighboring riparian right holders. *See, e.g., Hoover v. Crane*, 362 Mich. 36, 39, 106 N.W.2d 563, 564 (1960) (finding that an orchard, as an owner of littoral land, was not acting unreasonably by running its irrigation system, which lowered the water level on an already drought-stricken inland lake by 1/4 of an inch, because the harm caused to neighboring cottage owners was not substantial); *W. Michigan Dock & Mkt. Corp. v. Lakeland Invs.*, 534 N.W.2d 212, 215-16 (Mich. App. 1995) (allowing the defendant to

Defendant should be enjoined from regularly docking freighters that overhang the property line, the court must consider several factors. These factors include: the historical use of the property, the effect of the proposed use on the watercourse itself, the safety of the proposed use, the local custom regarding dock usage, and any harm caused by obstruction of other riparian rightsholders. *See id.* (relying on the ordinary nature of the commercial activity, the use of the neighboring properties, and a lack of actual obstruction in making its decision); *W. Michigan Dock & Mkt. Corp.*, 534 N.W.2d at 216 (relying on the commercial nature of the watercourse, temporal length of the obstruction caused, and the historical use of the site); *Original Hartlepool*, 5 Ch. D. at 720-23 (relying on the commercial nature of the watercourse, local custom regarding overlapping vessels, length of obstruction, lack of genuine safety issues).

## B. Factual Issues

The briefing provided by the parties makes various factual analogies to the aforementioned cases to argue why these precedents inexorably support their view of reasonableness. Reviewing both sets of arguments, however, the court is forced to conclude that a genuine factual dispute exists regarding key factors. Therefore, summary judgment in favor of either party on the dock use issue would be inappropriate.

### i. Undisputed Factors

Some of the factors that Michigan courts have in the past used to determine the reasonableness of a riparian rightsholder's proposed use are not factually in dispute.

---

continue to dock vessels on the side of his wharf for commercial purposes over his neighbor's bottomlands, but imposing time limits).

First, the size and historic character of the watercourse do not weigh against Defendant's use of the Revere Dock. The vessels docking at Defendant's facility are clearly "ordinary" for the type of commercial operations regularly conducted on this part of the Detroit River, and many of the lake freighters central to this dispute have been plying the river for over fifty years.[10] *See W. Michigan Dock & Mkt. Corp.*, 534 N.W.2d at 216. This stretch of waterfront property along the Detroit River has been used for industrial, maritime facilities for over a century. (*See* ECF No. 43-3, PageID.1021 (noting that the existing commercial platform dock on Plaintiff's property was built "at the turn of the [20th] century").) Until it was sold as separate parcels by the City of Detroit in 2015, the land that forms Defendant's "Revere Dock" and Plaintiff's adjoining bulk dock were both part of a site occupied by the Revere Copper and Brass factory for decades before its demolition in 1989, and while the factory operated, the site was an active shipping location.[11] (*Id.,* PageID.1022-24.) Warner testified in his deposition that Plaintiff decided to purchase only part of the parcel because he "couldn't see the need for the entire remainder of the Revere Copperware site" for Waterfront's operations, so he worked out an agreement whereby Steve Erickson was allowed to purchase the rest of the site from the city. (*Id.*)

---

[10] Indeed, four of the five freighters that made calls at Defendant's "Revere Dock" during the 2019 season have been in operation on the Great Lakes since 1952. *See* Marine Publishing Co., *Know Your Ships*, 88 (57th ed. 2016).

[11] *See also* Micah Walker, *Uranium-contaminated site in Detroit was part of the Manhattan Project*, Detroit Free Press (Dec. 6, 2019), https://www.freep.com/story/news/local/michigan/detroit/2019/12/06/uranium-contaminated-site-detroit-tied-manhattan-project/4353455002/ [https://perma.cc/BV97-MXK8] (recounting the interesting history of the Revere Brass and Copper factory and its connection to the Manhattan Project).

18

Second, perhaps because it conducts similar operations next-door, Plaintiff does not directly contend that Defendant's current bulk aggregate operation or its method of docking freighters would have a detrimental "effect on the water course" itself. *See Id.* While these undisputed factors point toward Defendant's use of the watercourse being reasonable, they are not dispositive in the present action because other factors that need to be considered in the court's holistic analysis remain unsettled.

### ii. Custom on the Watercourse

The factual disputes in the present case revolve largely around the requirement that the court "balance the benefit that would inure to the proposed user with the injury to the other riparian owners" when determining reasonableness. *Id.* Defendant argues that maritime custom supports his docking of vessels that extend beyond the property line. The testimony of the Frye family and Henry Warner respectively, along with affidavits provided by their respective expert witnesses, however, points to two very conflicting accounts of the docking custom in place on the Detroit River.

Jack and John Frye both provided deposition testimony affirming that it is standard practice for freighters calling at commercial facilities on the Great Lakes to overhang the property line, and they state that neighboring facilities operate on a "first come first serve[d]" basis. (ECF No. 43-12, PageID.1187; ECF No. 43-13, PageID.1220.) John Frye noted that at his companies' other maritime facilities that it is common to share dock space between neighboring facilities without express permission. (*Id.*, PageID.1220.) Defendants further support this contention with an affidavit from Michael Merrick, a recently retired captain with extensive sailing experience on the Great Lakes. Merrick confirmed that in his experience, "shipping

19

companies and dock operators adhere to the rule of 'first come, first serve[d]'" with the caveat that the first vessel, when possible, "must make all reasonable efforts to accommodate the vessels." (ECF No. 43-14, PageID.1226.)

Warner by contrast, testified based on his experience, that he "found it incredible that somebody would think about coming into a business where part of their business they'd have to use the facilities next door." (ECF No. 43-3, PageID.1003.) While Warner acknowledges that any one-thousand-foot freighters fueling at Plaintiff's fuel dock necessarily intrude upstream in front of a parcel owned by the James Group, he argues that situation is different because he reached a verbal, non-compensatory agreement with John James Sr. (the owner) authorizing the intrusion. (*Id.*, PageID.1013-14.)

To further support its position, Plaintiff also provides an affidavit from Sanjeev Kumar Gupta, a former captain turned maritime consultant, who has sailed worldwide, including on the Detroit River. (ECF No. 57-5, PageID.2539.) Gupta indicates that during his time sailing that he had "never encountered" the first come, first served custom and that the "custom is contrary to law and prudent seamanship." (*Id.*, PageID.2557-58.)

The parties have presented sufficient factual support for a reasonable factfinder to find in favor of either. Thus, a factual dispute exists regarding what customs are in place on the Detroit River. *See W. Michigan Dock & Mkt. Corp.*, 534 N.W.2d at 216; *Original Hartlepool*, 5 Ch. D. at 720-23.

### iii.  Safety

The court will also need to consider safety in determining if a riparian rightsholder's use of a watercourse is reasonable. *See, e.g., Original Hartlepool*, 5 Ch.

D. at 253 (discussing the safety of docking operations in determining reasonableness); *Jacobs v. Lyon Twp.,* 448 N.W.2d 861, 863 (Mich. App. 1989), *vacated on other grounds*, (considering, among other factors, if regular anchoring by pleasure craft in front of public road ends created an unreasonable safety issue on Higgins Lake). Plaintiff argues, based on the affidavit of its expert Kumar Gupta, that Defendant's practice of docking oversized boats has already created "hazards to navigation" for ships calling at Plaintiff's fuel dock. (ECF No. 57, PageID.2460.) Specifically, Gupta contends that "[d]espite the lack of delays to date, encroachment by DBS serviced vessels have created dangerous navigational situations by reducing the amount of operational dock space for [Plaintiff]'s customers." (ECF No. 57-5, PageID.2551.)

Defendant's employee provided contradicting testimony indicating that vessels could safely dock at the Revere Dock while Plaintiff used its existing fuel terminal. (ECF No. 43-2, PageID.960.) Furthermore, Defendant notes that "six Waterfront personnel were deposed in connection with this case, and not a single one claimed that any dangerous situation ever arose due to Defendant's operations." (ECF No. 58, PageID.2603; *see also* ECF No. 43-5, PageID.1058 (Plaintiff's barge manager testifying that "50, 60 feet between each vessel on the Detroit River" is a sufficient buffer).) And the court also notes that Warner's stated plans of setting up a second fuel dock on its property could create the same type of "close quarters" situation—regardless of Defendant's operations—that Gupta found to be a safety hazard in his report. (ECF No. 43-3, PageID.997, 1018.)

Based on this conflicting testimony, the court finds a genuine factual dispute exists with regards to the safety of Defendant's use of the Detroit River.

### iv. Economic Effect of the Obstruction

Finally, precedent is clear that the fact finder must weigh any financial injury to a neighboring riparian owner when determining the reasonableness of a riparian use. *See Three Lakes Ass'n*, 285 N.W.2d at 303. The scope of such an injury appears to also remain factually contested.

Plaintiff has admitted it did not experience any monetary damages as the result of Defendant's encroachment on its dock space during 2019. (ECF No. 43-11, PageID.1155.) But Plaintiff argues that it intends "to expand the operation of his fuel terminal within the entire footprint of the property he owns and entire dock frontage space," so Defendant's practice of overhanging the property line is bound to create actual conflicts in the near future. (ECF No. 44, PageID.1235.)

Defendant argues that Plaintiff's lack of actual economic losses weighs heavily in favor of its motion for summary judgment because it shows that unloading practices have had virtually no effect on Plaintiff. (ECF No. 43, PageID.908.)  And Defendant responds to Plaintiff's assertions—about the inevitably of future conflicts—by arguing that such future losses are speculative since Plaintiff has not committed to a specific expansion plan. (*See* ECF No. 52, PageID.2161 ("Mr. Warner claims that no written business plans or projections were developed before green lighting the [terminal expansion] project. In fact, Mr. Warner claims that the decision to assume $3 million in debt was taken by the 'seat of [his] pants.'").)

Because Defendant's wharf usage—less than twelve hours on average throughout any five-and-a-half day period during the shipping season—is not so great that a future conflict is inevitable (*see* ECF No. 57-5, PageID.2545), the court finds that

a question of fact exists regarding the scope of future losses alleged by the Plaintiff. Warner testified that his initial improvements to the downriver portion of its land could lend itself to three possible increased uses. (ECF No. 43-3, PageID.997, 1018 (noting the improved dock could also be used as a site of a second fueling terminal, a waiting area, or a storage area for its barges).) While Plaintiff's brief focuses on the potential construction of a new fueling station—presumably because it would lead to the most conflicts—it is not clear that Plaintiff has committed to such a path. For instance, Warner testified that Plaintiff has not yet developed an engineering plan for an expanded fueling operation. (*See* ECF No. 43-3, PageID.995.)

Even if the court assumes that increased use of Plaintiff's improved wharf makes space conflicts more likely, the varying potential uses for the downriver portion of the property suggested by Warner in his testimony could require injunctive relief differing in scope. Absent a showing of significant safety issues, at this juncture, the court thinks it is unlikely that any awarded injunctive relief would completely bar riparian encroachment by Defendant. Instead, when confronted with analogous situations, Michigan courts have issued injunctions that impose specific conditions on neighboring riparian right holder's meant to ensure its continued use of the watercourse is limited so that it does not cause an unreasonable injury to a neighbor. *See, e.g., W. Michigan Dock & Mkt. Corp.*, 534 N.W.2d 212 at 214-16 (endorsing a trial court's injunction that allowed defendant "to load and unload boats and ships in the slip [over plaintiff's] riparian property, but prohibiting it from anchoring vessels to the slip's lake bed and from docking vessels for more than one week without plaintiff's permission"); *Hoover*, 362 Mich. at 41-42, 106 N.W.2d at 565-66 (allowing an orchard, as a riparian right holder to

23

take a "reasonable" amount of water from an inland lake for irrigation, but requiring it to install a meter to verify that "total . . . pumpage" did not exceed a set limit). To determine the scope of such an injunction, the court would first need to make a factual determination about the nature and intensity of Plaintiff's use of its property going forward. The disputed nature of the evidence makes such a determination impossible at the summary judgment stage.

## IV. CONCLUSION

After a thorough review of the record, the court finds that significant factual disputes prevent the court from making a definitive determination at the summary judgment stage on the reasonableness of Defendant's practice of docking freighters at its Detroit bulk aggregate dock that regularly extend over the bottomlands of Plaintiff's neighboring commercial maritime facility. Therefore, both Plaintiff and Defendant's motions for summary judgment must be denied as to the maritime trespass issue. Accordingly,

IT IS ORDERED that Defendant DBS's Motion for Summary Judgment (ECF No. 43) is DENIED IN PART.

IT IS ORDERED that Plaintiff Waterfront's Motion for Summary Judgment (ECF No. 44) is DENIED IN PART.

s/Robert H. Cleland                        /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  August 25, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 25, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\AAB\Opinions and Orders\Civil\19-13621.WATERFRONT.PartialMSJ.AAB.RHC.docx